2015 WI 73

# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2013AP2435-CR |
| COMPLETE TITLE: | State of Wisconsin,<br>        Plaintiff-Respondent,<br>    v.<br>Fernando Ortiz-Mondragon,<br>        Defendant-Appellant-Petitioner. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
(Reported at 358 Wis. 2d 423, 856 N.W.2d 339)
(Ct. App. 2014 – Published)
PDC No: 2014 WI App 114

| | |
|---|---|
| OPINION FILED: | July 9, 2015 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | April 21, 2015 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Brown |
| JUDGE: | Donald R. Zuidmulder |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | |
| DISSENTED: | BRADLEY, ABRAHAMSON, J.J., dissent. (Opinion Filed.) |
| NOT PARTICIPATING: | |

ATTORNEYS:

For the defendant-appellant-petitioner, there were briefs by *Michelle L. Velasquez*, assistant state public defender, and oral argument by *Michelle L. Velasquez*.


For the plaintiff-respondent, the cause was argued by *Nancy A. Noet*, assistant attorney general, with whom on the brief was *Brad D. Schimel*, attorney general.


An amicus curiae brief was filed by *Barbara Graham* on behalf of the Catholic Charities Legal Services for Immigrants, Milwaukee.

2015 WI 73

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2013AP2435-CR
(L.C. No. 2012CF1101)

STATE OF WISCONSIN      :      IN SUPREME COURT

State of Wisconsin,

      Plaintiff-Respondent,

    v.

Fernando Ortiz-Mondragon,

      Defendant-Appellant-Petitioner.

**FILED**

**JUL 9, 2015**

Diane M. Fremgen
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals. *Affirmed.*

¶1 ANNETTE KINGSLAND ZIEGLER, J. This is a review of a published decision of the court of appeals,[1] which affirmed the Brown County Circuit Court's[2] judgment of conviction and order denying Fernando Ortiz-Mondragon's ("Ortiz-Mondragon") post-conviction motion to withdraw his no-contest plea to substantial battery as an act of domestic abuse.[3]

---

[1] State v. Ortiz-Mondragon, 2014 WI App 114, 358 Wis. 2d 423, 856 N.W.2d 339.

[2] The Honorable Donald R. Zuidmulder presided.

[3] Some documents in the record spell the defendant's name as Fernando Ortiz-Mondragen.

¶2 Ortiz-Mondragon argues that the circuit court erred by denying his motion to withdraw his plea. He argues that he should be allowed to withdraw his plea on the basis of ineffective assistance of counsel under Padilla v. Kentucky, 559 U.S. 356 (2010). In Padilla the Supreme Court held that "[w]hen the law is not succinct and straightforward . . . , a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences." Padilla v. Kentucky, 559 U.S. 356, 369 (2010). "But when the deportation consequence is truly clear, . . . the duty to give correct advice is equally clear." Id.

¶3 Specifically, Ortiz-Mondragon argues that his trial counsel performed deficiently by failing to inform him that his no-contest plea to substantial battery, with a domestic abuse enhancer, was certain to result in his deportation and permanent exclusion from the United States. He argues that these immigration consequences were clear and certain because his substantial battery was a "crime involving moral turpitude" under federal immigration law, thereby rendering him automatically deportable and permanently inadmissible.[4] Ortiz-

_____

[4] We recognize that an alien could be "deportable" if "convicted of a crime of domestic violence." 8 U.S.C. § 1227(a)(2)(E)(i). However, whether an alien will actually be deported because of such a conviction is far from certain. We do not address this issue because it was not raised, briefed, or argued by any of the parties in the case at issue. See Aurora Consol. Health Care v. LIRC, 2012 WI 49, ¶43 n.7, 340
(continued)

2

Mondragon further argues that his trial counsel performed deficiently by failing to research or consider the possible immigration consequences of the plea agreement. He argues that this deficient performance prejudiced him because he would have insisted on going to trial had he known that his plea to substantial battery would subject him to mandatory deportation and permanent exclusion from the United States. He reasons that, because he has lived, worked, and raised a family in the United States since 1997, he would have sought a plea agreement that avoided these immigration consequences. If he were unable to secure such a plea agreement, he argues that he would have gone to trial to leave open the possibility of remaining in the United States.

¶4 The State argues that the circuit court correctly denied Ortiz-Mondragon's motion to withdraw his plea. The State argues that trial counsel's performance was not deficient. The State contends that, because federal law is not succinct and straightforward with respect to the possible immigration consequences of Ortiz-Mondragon's plea, trial counsel gave correct advice under <u>Padilla</u> when he advised Ortiz-Mondragon that the "plea could result in deportation, the exclusion of admission to this country, or the denial of naturalization under federal law." Specifically, the State contends that federal immigration law does not clearly and succinctly provide that

Wis. 2d 367, 814 N.W.2d 824 (declining to address arguments not raised before this court).

Ortiz-Mondragon's conviction for substantial battery would constitute a crime involving moral turpitude.  The State further argues that, if we determine that trial counsel's performance was deficient, we should remand the matter to the circuit court for an evidentiary hearing on the issue of whether the deficiency prejudiced Ortiz-Mondragon.

¶5  We conclude that Ortiz-Mondragon is not entitled to withdraw his no-contest plea to substantial battery because he did not receive ineffective assistance of counsel. Specifically, his trial counsel did not perform deficiently. Because federal immigration law is not "succinct, clear, and explicit" in providing that Ortiz-Mondragon's substantial battery constituted a crime involving moral turpitude, his attorney "need[ed] [to] do no more than advise [him] that pending criminal charges may carry a risk of adverse immigration consequences."  See Padilla, 559 U.S. at 369.  Ortiz-Mondragon's trial attorney satisfied that requirement by conveying the information contained in the plea questionnaire and waiver of rights form——namely, that Ortiz-Mondragon's "plea could result in deportation, the exclusion of admission to this country, or the denial of naturalization under federal law."  Counsel's advice was correct, not deficient, and was consistent with Wis. Stat. § 971.08(1)(c) (2011-12).[5]  In addition, Ortiz-Mondragon's

---

[5] This statute provides:

> Before the court accepts a plea of guilty or no contest, it shall . . . [a]ddress the defendant personally and advise the defendant as follows: "If

(continued)

4

trial attorney did not perform deficiently by failing to further research the immigration consequences of the plea agreement. Because Ortiz-Mondragon failed to prove deficient performance, we do not consider the issue of prejudice.

## I. FACTUAL AND PROCEDURAL BACKGROUND

¶6 In 1997 Ortiz-Mondragon came to the United States from Mexico. In 2002 he moved to Wisconsin to work in the agricultural industry. He has four children, all of whom are United States citizens and reside in Wisconsin.

¶7 On September 14, 2012, the State filed a criminal complaint charging Ortiz-Mondragon with: (1) substantial battery, contrary to Wis. Stat. § 940.19(2); (2) false imprisonment, contrary to Wis. Stat. § 940.30; (3) felony intimidation of a victim, contrary to Wis. Stat. § 940.45(1); (4) criminal damage to property, contrary to Wis. Stat. § 943.01(1); and (5) disorderly conduct, contrary to Wis. Stat. § 947.01(1). Each count included a domestic abuse enhancer under Wis. Stat. § 968.075. All of the counts stemmed from one incident that occurred on September 12, 2012.

---

you are not a citizen of the United States of America, you are advised that a plea of guilty or no contest for the offense with which you are charged may result in deportation, the exclusion from admission to this country or the denial of naturalization, under federal law."

Wis. Stat. § 971.08(1)(c) (2011-12). All subsequent references to the Wisconsin Statutes are to the 2011-12 version unless otherwise indicated.

¶8 According to the complaint, Ortiz-Mondragon violently attacked J.S., who was his cohabiting girlfriend at the time and who is the mother of two of his children. Ortiz-Mondragon became enraged because J.S. was talking to a male neighbor on the phone. Ortiz-Mondragon jumped on top of J.S. while she was talking on the phone in bed. Their two young children were in the room with them. Ortiz-Mondragon put his hands around J.S.'s neck and began squeezing. J.S. had trouble breathing and thought that Ortiz-Mondragon was going to kill her. When J.S. managed to get off of the bed and tried to leave the bedroom, Ortiz-Mondragon punched her in the face and mouth and hit her in the back of the head. J.S.'s head bled profusely. Ortiz-Mondragon also broke J.S.'s phone in half. When J.S. later sought treatment for her injuries, a wound on her face required five staples.

¶9 On September 24, 2012, Ortiz-Mondragon waived his right to a preliminary examination and was bound over for trial. That same day, the State filed an information that contained the same five charges as the complaint.

¶10 On November 15, 2012, the State made a plea offer to Ortiz-Mondragon. If Ortiz-Mondragon pled guilty or no contest to substantial battery, criminal damage to property, and disorderly conduct, all with a domestic abuse enhancer, the State would dismiss and read-in the intimidation and false imprisonment charges. The State would recommend three years of probation and four months in jail as a condition of probation.

¶11 On November 27, 2012, the circuit court held a plea and sentencing hearing. Ortiz-Mondragon's attorney, Raj Kumar Singh ("Attorney Singh"), informed the court that the State recently made a plea offer to the defendant. Attorney Singh stated that he had "presented" the State's plea offer to Ortiz-Mondragon, "given him paperwork to use to study it, given him information to use in counseling, and [Ortiz-Mondragon] has just now confirmed that now he's made his final decision. He would like to take the offer."

¶12 Attorney Singh then handed a plea questionnaire and waiver of rights form, along with "some other papers," to the circuit court. Ortiz-Mondragon had signed the plea questionnaire and waiver of rights form, which stated, inter alia: "I understand that if I am not a citizen of the United States, my plea could result in deportation, the exclusion of admission to this country, or the denial of naturalization under federal law." Attorney Singh had signed the plea questionnaire and waiver of rights form immediately below the following affirmation: "I am the attorney for the defendant. I have discussed this document and any attachments with the defendant. I believe the defendant understands it and the plea agreement. The defendant is making this plea freely, voluntarily, and intelligently. . . . "

¶13 Ortiz-Mondragon then stated that he wished to plead no contest to three counts pursuant to the plea agreement. The circuit court then informed him of the possible immigration consequences of his pleas.

7

THE COURT: All right.  The law requires I address you now and advise you of the following: If you're not a citizen of the United States, the plea you offer me could result in your deportation, the exclusion of admission, or the denial of naturalization under federal law. . . .

These are collateral consequences to [sic] on top of whatever I sentence you to.  Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  All right.  Do you still wish to offer me these pleas then?

THE DEFENDANT:  Yes.

¶14 The circuit court then confirmed that Ortiz-Mondragon and his attorney had discussed the plea questionnaire and waiver of rights form, which contained a warning about possible immigration consequences of a conviction.

THE COURT:  All right.  In my right hand I have a plea-questionnaire-and-waiver-of-rights form.  I have the standard jury instruction for the charge of substantial battery with intent to cause bodily harm as well as the elements of criminal damage and disorderly conduct.  Do you see all these documents?

THE DEFENDANT:  Yes.

THE COURT:  Did you sign the plea questionnaire?

THE DEFENDANT:  Yes.

THE COURT:  Before you signed it, did you read it over carefully?

THE DEFENDANT:  Yes.

THE COURT: And while you were going over all these documents, did you have an opportunity to fully discuss it with your attorney, Mr. Singh?

THE DEFENDANT:  Yes.

8

THE COURT: And are you satisfied with his representation thus far?

THE DEFENDANT: Yes.

¶15 The court concluded: "I'm going to find the defendant's pleas today to be freely, voluntarily, and intelligently entered on the record I have made. I'll incorporate in support of that the plea-questionnaire-and-waiver-of-rights form." The court then determined that "[t]he facts do support his pleas" and "adjudge[d] him guilty today of substantial battery and criminal damage to property and disorderly conduct."

¶16 The State then explained that, pursuant to a joint recommendation, it was going to recommend "three years' probation with four months' jail and other standard conditions of probation." The State explained that it had "consulted with the victim," Ortiz-Mondragon committed a "fairly violent offense," and he had no prior criminal record. The State also noted that although Ortiz-Mondragon "was on an immigration hold at the . . . initial appearance," he was not "on any other type of hold at all."

¶17 The victim of Ortiz-Mondragon's domestic abuse, J.S., then spoke to the court. She stated that she would like for the felony battery charge to be reduced to a misdemeanor. J.S. stated that Ortiz-Mondragon has two children with her and also has two other children, and they "were trying to keep them here in the states, but if he ends up with a felony charge, that's not going to happen." The court informed J.S. that Ortiz-

Mondragon had just been found guilty of a felony. J.S. then stated that probation and four months in jail were "fine" with her.

¶18 Attorney Singh then asked the court to grant Ortiz-Mondragon sentence credit, which the court granted. The court then asked Attorney Singh whether Ortiz-Mondragon has an Immigration and Customs Enforcement hold.[6] Attorney Singh stated, "I think there is, but the information I get is secondhand."

¶19 Ortiz-Mondragon then apologized for his behavior and stated that he "never had a problem like this before."

¶20 The court then proceeded to sentence Ortiz-Mondragon. It stated that its sentence would be based on "the protection of the public, punishment of the defendant, the defendant's rehabilitative needs, and other factors." The court noted that it received a joint recommendation and that it "defer[s] a little bit to [the State's] judgment" in "these kinds of cases because [the State] handle[s] so many of them . . . ." The court then discussed the "great impact parents' behaviors have on their children" and encouraged Ortiz-Mondragon to "do a better job of being a parent and an adult." The court then adopted the joint recommendation, withheld sentence on all three counts, placed Ortiz-Mondragon on probation for three years, and

---

[6] The United States Immigration and Customs Enforcement is a component of the United States Department of Homeland Security.

sentenced him to four months in the county jail as a condition of probation.

¶21  J.S. then asked the court if Ortiz-Mondragon will "be let go" after his jail sentence.  The court stated that he would be let go "if the immigration doesn't put a hold on him.  If the immigration people put a hold on him, that's a federal issue.  Our officers have nothing to do with that."

¶22  After Ortiz-Mondragon completed his jail sentence,[7] Immigration and Customs Enforcement took him into custody and commenced removal proceedings against him.  He agreed to a voluntary departure to avoid a deportation on his record.[8]

¶23  On September 17, 2013, Ortiz-Mondragon filed a postconviction motion to withdraw his no-contest plea to substantial battery on grounds of ineffective assistance of counsel.  In the motion, Ortiz-Mondragon argued that his

---

[7] The record does not indicate exactly when Ortiz-Mondragon was released from jail.  At the plea and sentencing hearing on November 27, 2012, the circuit court sentenced Ortiz-Mondragon to four months in jail and granted him 76 days of sentence credit.  Accordingly, he seems to have been released from jail in early or mid-January 2013.

[8] Ortiz-Mondragon's motion to withdraw his plea discusses these events but does not indicate when they took place.  The record contains a letter from Immigration and Customs Enforcement ("ICE"), which was filed with the Brown County Circuit Court on December 12, 2012.  This letter requested that the circuit court forward to ICE certified copies of the complaint, information, judgment and commitment order for this case.  The letter stated that these documents would help ICE "in its efforts to expeditiously remove alien criminals from the United States."  Under "charge(s)," the letter stated "940.19(2) Substantial Battery——Intend Bodily Harm."

11

substantial battery as an act of domestic abuse was a "crime involving moral turpitude" under federal immigration law, thereby rendering him subject to mandatory deportation and permanent exclusion from the United States. He argued that these consequences of his substantial battery conviction were clear and that under Padilla his attorney performed deficiently in failing to inform him of these consequences. Ortiz-Mondragon further argued that this deficiency prejudiced him. He contended that, had he known the immigration consequences of this conviction, he would have sought a different plea agreement or would have insisted on going to trial in order to preserve the possibility of remaining in or returning to the United States to be with his family.

¶24 On October 29, 2013, the circuit court issued a written order denying Ortiz-Mondragon's motion without a Machner hearing.[9] The court first held that Ortiz-Mondragon's "trial counsel was not required to provide [Ortiz-Mondragon] with unequivocal advice regarding the immigration-related consequences of his plea because the law elucidating the

_____

[9] See State v. Machner, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979). "[T]he circuit court has the discretion to deny the postconviction motion without a Machner hearing 'if the motion fails to allege sufficient facts to raise a question of fact, presents only conclusory allegations, or if the record conclusively demonstrates that the defendant is not entitled to relief.'" State v. Roberson, 2006 WI 80, ¶43, 292 Wis. 2d 280, 717 N.W.2d 111 (emphasis added in Roberson) (quoting State v. Curtis, 218 Wis. 2d 550, 555 n. 3, 582 N.W.2d 409 (Ct. App. 1998)).

12

consequences is not succinct and straightforward." The court reasoned that "a 'crime involving moral turpitude' is a broad, rather than specific, classification of crimes," and Ortiz-Mondragon failed to prove that his substantial battery was a crime involving moral turpitude. Quoting Padilla, 559 U.S. at 369, the circuit court stated that, "[b]ecause the law is not succinct and straightforward, [Ortiz-Mondragon's] counsel 'need do no more than advise [Ortiz-Mondragon] that pending criminal charges may carry a risk of adverse immigration consequences.'" Ortiz-Mondragon "does not assert that trial counsel did not so advise him, and the record affirmatively establishes that trial counsel did so advise him."

¶25 The circuit court discussed the immigration warnings and advice that Ortiz-Mondragon received. In particular, the court noted that Ortiz-Mondragon "acknowledges that he was given equivocal immigration warnings by both the Court, as required by [Wis. Stat. §] 971.08, and the Plea Questionnaire/Waiver of Rights form." The court also noted that, at the plea and sentencing hearing, "[Ortiz-Mondragon] confirmed with the Court that he read [the plea questionnaire] over carefully before signing it and had the opportunity to fully discuss it with his attorney." The court further noted that Attorney Singh signed the plea questionnaire form under a statement affirming that he discussed that form with Ortiz-Mondragon and that Ortiz-Mondragon understood the form and the plea agreement. The court concluded that Attorney Singh did not perform deficiently. Specifically, the court concluded that "[u]nder the

13

circumstances, [Ortiz-Mondragon] has not stated sufficient facts which entitle him to a hearing on his postconviction motion. The facts, as alleged, demonstrate that [Ortiz-Mondragon's] counsel did not perform deficiently by providing [Ortiz-Mondragon] with equivocal, rather than unequivocal, advice regarding the immigration-related consequences of his plea." The court did not address the issue of prejudice.

¶26 On October 7, 2014, the court of appeals affirmed the circuit court's order denying Ortiz-Mondragon's motion to withdraw his plea. The court of appeals explained that Ortiz-Mondragon "has not identified clear authority indicating any of the crimes to which he pled were crimes of moral turpitude." State v. Ortiz-Mondragon, 2014 WI App 114, ¶13, 358 Wis. 2d 423, 856 N.W.2d 339. The court of appeals reasoned that "[i]f an attorney must search federal court and unfamiliar administrative board decisions from around the country to identify a category of elements that together constitute crimes of moral turpitude, and then determine whether a charged crime fits that category, then the law is not 'succinct, clear, and explicit.'" Id., ¶12 (quoting Padilla, 559 U.S. at 368). It concluded that "Ortiz-Mondragon's attorney did not perform deficiently by failing to unequivocally inform him that his plea would result in deportation and permanent inadmissibility." Id., ¶13. The court of appeals did not address the issue of prejudice.

¶27 On November 6, 2014, Ortiz-Mondragon filed a petition for review, which we granted on December 18, 2014.

II. STANDARD FOR PLEA WITHDRAWAL AND STANDARD OF REVIEW

14

¶28 "In general 'a circuit court should freely allow a defendant to withdraw his plea prior to sentencing for any fair and just reason, unless the prosecution [would] be substantially prejudiced.'" State v. Lopez, 2014 WI 11, ¶2, 353 Wis. 2d 1, 843 N.W.2d 390 (emphasis added) (quoting State v. Jenkins, 2007 WI 96, ¶2, 303 Wis. 2d 157, 736 N.W.2d 24) (internal quotation marks omitted). In contrast, "the general rule [is] that a defendant seeking to withdraw a guilty or no contest plea after sentencing must prove manifest injustice by clear and convincing evidence." State v. Negrete, 2012 WI 92, ¶29, 343 Wis. 2d 1, 819 N.W.2d 749 (emphasis added) (citations omitted). Ineffective assistance of counsel is one type of manifest injustice. State v. Taylor, 2013 WI 34, ¶49, 347 Wis. 2d 30, 829 N.W.2d 482.

¶29 "The clear and convincing standard for plea withdrawal after sentencing, which is higher than the 'fair and just' standard before sentencing, 'reflects the State's interest in the finality of convictions, and reflects the fact that the presumption of innocence no longer exists.'" Id., ¶48 (quoting State v. Cross, 2010 WI 70, ¶42, 326 Wis. 2d 492, 786 N.W.2d 64). "The higher burden 'is a deterrent to defendants testing the waters for possible punishments.'" Id. (quoting State v. Nawrocke, 193 Wis. 2d 373, 379-80, 534 N.W.2d 624 (Ct. App. 1995)). "Disappointment in the eventual punishment does not rise to the level of a manifest injustice." Id., ¶49 (citing Nawrocke, 193 Wis. 2d at 379).

15

¶30 "A claim of ineffective assistance of counsel is a mixed question of fact and law." State v. Carter, 2010 WI 40, ¶19, 324 Wis. 2d 640, 782 N.W.2d 695 (citations omitted). "We will uphold the circuit court's findings of fact unless they are clearly erroneous." Id. (citation omitted). "Findings of fact include 'the circumstances of the case and the counsel's conduct and strategy.'" Id. (quoting State v. Thiel, 2003 WI 111, ¶21, 264 Wis. 2d 571, 665 N.W.2d 305) (quotation marks omitted). "Moreover, this court will not exclude the circuit court's articulated assessments of credibility and demeanor, unless they are clearly erroneous." Id. (citing Thiel, 264 Wis. 2d 57, ¶23). "However, the ultimate determination of whether counsel's assistance was ineffective is a question of law, which we review de novo." Id.

### III. ANALYSIS

¶31 "Both the United States Constitution and the Wisconsin Constitution guarantee criminal defendants the right to counsel." Carter, 324 Wis. 2d 640, ¶20 (citing U.S. Const. amend. VI; Wis. Const. art. I, § 7). "The United States Supreme Court has recognized that 'the right to counsel is the right to the effective assistance of counsel.'" Id. (quoting Strickland v. Washington, 466 U.S. 668, 686 (1984)) (quotation marks omitted).

¶32 "Whether a convicted defendant received ineffective assistance of counsel is a two-part inquiry." Id., ¶21 (citing Strickland, 466 U.S. at 687). "First, the defendant must prove that counsel's performance was deficient." Id. (citing

16

Strickland, 466 U.S. at 687). "Second, if counsel's performance was deficient, the defendant must prove that the deficiency prejudiced the defense." Id. (citing Strickland, 466 U.S. at 687). To succeed on a claim of ineffective assistance of counsel, a defendant must prove both deficient performance and prejudice. Id. (citing Strickland, 466 U.S. at 687). If a defendant fails to prove deficient performance, a reviewing court need not consider whether the defendant was prejudiced. See id., ¶36; State v. Franklin, 2001 WI 104, ¶13, 245 Wis. 2d 582, 629 N.W.2d 289 (citing Strickland, 466 U.S. at 697).

¶33 The Supreme Court in Padilla held "that advice regarding deportation is not categorically removed from the ambit of the Sixth Amendment right to counsel." Id. at 366. The Court explained that the scope of counsel's duty to provide advice regarding deportation depends on whether the immigration consequences of a conviction are clear, succinct, and straightforward. It explained that counsel's duty to provide advice regarding deportation "is more limited" in "situations in which the deportation consequences of a particular plea are unclear or uncertain." Id. at 369. Specifically, "[w]hen the law is not succinct and straightforward . . . , a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences." Id. (emphases added). "But when the deportation consequence is truly clear, . . . the duty to give correct advice is equally clear." Id.

17

¶34 The Court in Padilla held that defense counsel performed deficiently by incorrectly advising the defendant that he would not be deported upon conviction. Id. at 368-69. The Court reasoned that "the terms of the relevant immigration statute are succinct, clear, and explicit in defining the removal consequence for Padilla's conviction." Id. at 368 (citing 8 U.S.C. § 1227(a)(2)(B)(i)). "The consequences of Padilla's plea could easily be determined from reading the removal statute, his deportation was presumptively mandatory, and his counsel's advice was incorrect." Id. at 369.

¶35 In order to determine whether Ortiz-Mondragon's trial counsel performed deficiently, we must first determine what advice Padilla required Ortiz-Mondragon's trial attorney to provide. To that end, we will determine whether immigration law is succinct, clear, and explicit such that Ortiz-Mondragon's trial attorney should have discovered that Ortiz-Mondragon would be deported and excluded because his substantial battery was a crime involving moral turpitude. Second, we will determine whether Ortiz-Mondragon's trial attorney performed deficiently under Padilla by giving inadequate advice and failing to further research the immigration consequences of the plea agreement. Because we conclude that Ortiz-Mondragon's trial attorney did not perform deficiently, we do not address prejudice.

A. Is Immigration Law Succinct, Clear, and Explicit
that Ortiz-Mondragon's Substantial Battery
Was a Crime Involving Moral Turpitude?

18

¶36 The relevant immigration statutes authorize deportation and exclusion of an alien who is convicted of a "crime involving moral turpitude."[10] Under certain circumstances, "[a]ny alien who . . . is convicted of a crime involving moral turpitude . . . is deportable." 8 U.S.C. § 1227(a)(2)(A)(i). Any such alien "shall, upon the order of the Attorney General, be removed . . . ." 8 U.S.C. § 1227(a) (intro.). The Attorney General may not "cancel removal" of an alien who is "inadmissible or deportable" due to a conviction for a crime involving moral turpitude. See 8 U.S.C. § 1229b(b)(1)(C). Further, an alien is "ineligible to receive visas and ineligible to be admitted to the United States" if "convicted of . . . a crime involving moral turpitude . . . ." 8 U.S.C. § 1182(a)(2)(A)(i)(I).

¶37 However, the Immigration and Nationality Act, which includes those statutory provisions, does not define "crime involving moral turpitude." See Padilla, 559 U.S. at 361; id. at 377-78 (Alito, J., concurring). The Code of Federal Regulations also does not define that term. Garcia v. State, 425 S.W.3d 248, 260 (Tenn. 2013) ("[A] crime involving moral turpitude is nowhere defined in the [Immigration and Nationality] Act or in the Code of Federal Regulations."). The Immigration and Nationality Act does not even list examples of crimes involving moral turpitude. Lopez-Penaloza v. State, 804

---

[10] "The term 'alien' means any person not a citizen or national of the United States." 8 U.S.C. § 1101(a)(3).

N.W.2d 537, 544 (Iowa Ct. App. 2011) ("The [Immigration and Nationality Act] does not define the term 'moral turpitude' or list [crimes involving moral turpitude].").

¶38 Thus, because the term "crime involving moral turpitude" is undefined in the immigration statutes, we will consider case law that defines this term. We need to determine whether immigration law is succinct, clear, and explicit such that Ortiz-Mondragon's counsel was deficient for failing to discover that the substantial battery offense was a crime involving moral turpitude and advise Ortiz-Mondragon to that effect. Because we conclude that immigration law is not succinct, clear, and explicit in this case, counsel was not deficient for not giving further immigration advice to Ortiz-Mondragon. In order to explain how immigration law is not succinct, clear, and explicit in this case, we will discuss cases wherein the subject of the dispute was whether a particular crime qualified as a crime involving moral turpitude. One important difference between the cases we will discuss and the case at issue is that the analysis in those cases concerned appeals from actual deportation proceedings. The dispute in those cases was not whether counsel was ineffective for failing to discover and then advise that a specific crime involved moral turpitude.

¶39 Even the case law that analyzes whether a crime qualified as a crime involving moral turpitude for purposes of deportation often uses terms of generality, not specifics. "[T]he phrase 'crime involving moral turpitude' is notoriously

20

baffling . . . ." Garcia-Meza v. Mukasey, 516 F.3d 535, 536 (7th Cir. 2008)." "As a general rule, a crime involves 'moral turpitude' if it is inherently base, vile, or depraved, and contrary to the accepted rules of morality and the duties owed between persons or to society in general." In re Sanudo, 23 I. & N. Dec. 968, 970 (BIA 2006) (emphasis added); see also Garcia-Meza, 516 F.3d at 536. The term "crime involving moral turpitude" "generally refers to acts that are per se morally reprehensible and intrinsically wrong." In re Solon, 24 I. & N. Dec. 239, 240 (BIA 2007) (emphasis added) (citing Rodriguez v. Gonzales, 451 F.3d 60, 63 (2d Cir. 2006)). The United States Court of Appeals for the Seventh Circuit has "put [its] own gloss on the term," "stating that crimes of moral turpitude are usually serious crimes (in terms of the magnitude of the loss they cause or the indignation in the public they arouse) that are committed deliberately." Garcia-Meza, 516 F.3d at 536 (emphasis added). Thus, even in deportation proceedings themselves, the issue of what constitutes a crime involving moral turpitude is frequently litigated as it is often less than clear.

¶40 Even in deportation proceeding cases where the subject of the litigation is whether a crime qualifies as a crime involving moral turpitude, "[n]either the seriousness of the underlying offense nor the severity of the punishment imposed is determinative of whether a crime involves moral turpitude." Solon, 24 I. & N. Dec. at 240 (citing In re Serna, 20 I. & N. Dec. 579, 581 (BIA 1992)). "[A]t least in the context of

21

assault crimes, a finding of moral turpitude involves an assessment of both the state of mind and the level of harm required to complete the offense." Id. at 243. "Thus, intentional conduct resulting in a meaningful level of harm, which must be more than mere offensive touching, may be considered morally turpitudinous." Id. (emphasis added).

¶41 In addition to the fact that the amorphous term "crime involving moral turpitude" is not defined, it is even more problematic to ascertain whether a particular crime would qualify as a crime involving moral turpitude. Padilla, 559 U.S. at 378 (Alito, J., concurring) ("As has been widely acknowledged, determining whether a particular crime is . . . a 'crime involving moral turpitude [(CIMT)]' is not an easy task."). Even courts confronted with analyzing crimes involving moral turpitude in deportation proceedings are not uniform in their analysis of whether a crime qualified as a crime involving moral turpitude. Five federal circuit courts of appeals apply a two-step test consisting of a "categorical approach" and "modified categorical approach."[11] Two other circuits follow a three-step test for determining whether a crime qualifies as a

---

[11] See Silva-Trevino v. Holder, 742 F.3d 197, 200 & n.1 (5th Cir. 2014); Olivas-Motta v. Holder, 746 F.3d 907, 911-16 (9th Cir. 2013) (amended opinion); Prudencio v. Holder, 669 F.3d 472, 480-84 (4th Cir. 2012); Fajardo v. U.S. Att'y Gen., 659 F.3d 1303, 1307-11 (11th Cir. 2011); Jean-Louis v. Att'y Gen. of United States, 582 F.3d 462, 472-82 (3d Cir. 2009).

crime involving moral turpitude.[12] In the wake of Descamps v. United States, how federal courts will determine whether a crime qualifies as a crime involving moral turpitude is unclear. See Descamps v. United States, 570 U.S. ___, 133 S. Ct. 2276, 282 (2013) (holding "that sentencing courts may not apply the modified categorical approach when the crime of which the defendant was convicted has a single, indivisible set of elements"); id. at 2288-89 (holding that under the modified categorical approach, a court may rely on "only facts . . . constituting elements of the offense," rather than "rely[ing] on its own finding about a non-elemental fact"). Thus, relevant immigration law is far from succinct, clear, and explicit as to what constitutes a crime involving moral turpitude. See State v. Telford, 22 A.3d 43, 49-50 (N.J. App. Div. 2011) (holding that immigration law was not succinct, clear, and explicit because of a circuit split "surrounding the type of analysis that would be undertaken by the tribunals charged with determining whether a noncitizen has committed an aggravated felony").

---

[12] See Bobadilla v. Holder, 679 F.3d 1052, 1057 (8th Cir. 2012); Mata-Guerrero v. Holder, 627 F.3d 256, 260 (7th Cir. 2010). For a discussion of the categorical approach and modified categorical approach, see Descamps v. United States, 570 U.S. ___, 133 S. Ct. 2276, 2281-82 (2013). For a discussion of the two- and three-step tests, see In re Silva-Trevino, 26 I. & N. Dec. 550, 550-51 (A.G. 2015); Maria Theresa Baldini-Potermin, Defending Non-Citizens in Illinois, Indiana, and Wisconsin 3-5 to 3-9 (2009), available at https://www.immigrantjustice.org/defendersmanual.

¶42 In addition to that circuit split, the United States Attorney General has added to the complexity of determining whether a crime will qualify as a crime involving moral turpitude. In 2008 the United States Attorney General adopted the three-step test for the Board of Immigration Appeals.[13] In re Silva-Trevino, 24 I. & N. Dec. 687 (A.G. 2008). However, on April 10, 2015, the Attorney General issued an opinion vacating his In re Silva-Trevino opinion in its entirety. In re Silva-Trevino, 26 I. & N. Dec. 550, 550, 554 (A.G. 2015). That 2015 opinion seemingly leaves unresolved how the Board of Immigration Appeals should determine whether a crime will qualify as a crime involving moral turpitude. That opinion stated that

the Board may address, in this case and other cases as appropriate, the following issues:

1. How adjudicators are to determine whether a particular criminal offense is a crime involving moral turpitude under the Act;

2. When, and to what extent, adjudicators may use a modified categorical approach and consider a record of conviction in determining whether an alien has been "convicted of . . . a crime involving moral turpitude" . . . .

Id., 26 I. & N. Dec. at 553.

¶43 In her comprehensive guide on the immigration consequences of convictions, Maria Theresa Baldini-Potermin wrote in 2009 that "[t]he current state of the case law for

---

[13] The Board of Immigration Appeals is an administrative appellate body within the United States Department of Justice.

crimes involving moral turpitude is presently in a state of flux . . . ." Maria Theresa Baldini-Potermin, Defending Non-Citizens in Illinois, Indiana, and Wisconsin 3-5 (2009), available at https://www.immigrantjustice.org/defendersmanual.

¶44 Recognizing this lack of clarity, the State argues that, "[w]hile Ortiz-Mondragon's conviction may well qualify as a crime of moral turpitude, that conclusion is not 'clear and certain' or 'succinct and straightforward.'" The State notes that case law has held that domestic battery is not necessarily a crime involving moral turpitude. The State argues that the relevant case law and the circuit split regarding the two- or three-step test "illustrate the complexity of deciphering whether a given offense is a crime involving moral turpitude." Thus, because Ortiz-Mondragon's conviction does not clearly constitute a crime involving moral turpitude, the State contends "that Ortiz-Mondragon's trial attorney was required to do no more than advise him that his plea 'may carry a risk of adverse immigration consequences.'" Padilla, 559 U.S. at 369.

¶45 Despite the lack of any clear guidance by statute or jurisprudence regarding whether a particular crime qualifies as a crime involving moral turpitude, Ortiz-Mondragon argues that federal law is "succinct" and "straightforward" in providing that his substantial battery was a crime involving moral turpitude such that his counsel should have given him different advice. He contends that "[s]ome crimes, such as substantial battery, domestic abuse, are universally treated as [crimes involving moral turpitude] . . . ." In both of his briefs to

25

this court, he provides string cites to several cases that, according to him, support that conclusion.[14] He argues that this court can determine that his substantial battery was a crime involving moral turpitude simply by looking at Wis. Stat. § 940.19(2) and the case law addressing "similar offenses."

¶46 For example, Ortiz-Mondragon relies on two spousal abuse deportation cases arising from California: Grageda v. U.S. I.N.S., 12 F.3d 919 (9th Cir. 1993), superseded by statute on other grounds, and In re Tran, 21 I. & N. Dec. 291 (BIA 1996). In Grageda the Ninth Circuit held "that spousal abuse under [California Penal Code] section 273.5(a) is a crime of moral turpitude." Grageda, 12 F.3d at 922. In In re Tran the Board of Immigration Appeals expanded the holding in Grageda and concluded "that any violation of section 273.5(a) of the California Penal Code constitutes a crime involving moral turpitude." In re Tran, 21 I. & N. Dec. at 294. However, the

---

[14] Ortiz-Mondragon also relies on publications that do not have the force of law. For example, he cites to the Immigrant Defense Project's Immigration Consequences of Convictions Summary Checklist, which states that crimes involving moral turpitude "includ[e]" "[c]rimes in which bodily harm is caused or threatened by an intentional act, or serious bodily harm is caused or threatened by a reckless act . . . ." However, that checklist does not cite to legal authority for that proposition and does not state that such crimes necessarily are crimes involving moral turpitude. To the contrary, such crimes may be considered crimes involving moral turpitude. See In re Solon, 24 I. & N. Dec. 239, 243 (BIA 2007) ("[I]ntentional conduct resulting in a meaningful level of harm, which must be more than mere offensive touching, may be considered morally turpitudinous.").

26

Ninth Circuit in Grageda explained that its holding was limited to spousal abuse and did not include abuse of a cohabitant.[15] Grageda, 12 F.3d at 921-22 n.1.

¶47 In a subsequent decision, the Ninth Circuit recognized the narrow holding of Grageda and concluded that a "conviction under Cal. Penal Code § 273.5(a) for abuse of a cohabitant is not categorically a [crime involving moral turpitude]." Morales-Garcia v. Holder, 567 F.3d 1058, 1064-67 (9th Cir. 2009).[16] In Morales-Garcia the Ninth Circuit expressly declined to follow In re Tran. Id. at 1066 & n.4. Accordingly, it is unclear whether abuse of a cohabitant, in violation of Cal.

---

[15] The Ninth Circuit's holding in Grageda may be limited to spousal abuse that willfully causes a "traumatic condition." See Morales-Garcia v. Holder, 567 F.3d 1058, 1065 (9th Cir. 2009) (quoting Grageda v. U.S. I.N.S., 12 F.3d 919, 922 (9th Cir. 1993)) (internal quotation marks omitted) ("In Grageda, for example, we held that 'when a person willfully beats his or her spouse severely enough to cause a traumatic condition, he or she has committed an act of baseness or depravity contrary to accepted moral standards.'"). Ortiz-Mondragon does not discuss whether substantial battery under Wis. Stat. § 940.19(2) involves the willful infliction of a traumatic condition.

[16] In Morales-Garcia the Ninth Circuit held that abuse of a cohabitant is not necessarily a crime involving moral turpitude because not all cohabitants "are committed to, trust, or depend upon each other." Morales-Garcia, 567 F.3d at 1066. If cohabitants are not committed to such a relationship, then their status as cohabitants does not transform a battery offense into a crime involving moral turpitude. See id. But if cohabitants are committed to such a relationship, then their status as cohabitants "may transform" a battery offense into a crime involving moral turpitude. See id. at 1065 ("Otherwise non-morally turpitudinous conduct targeted at a victim with whom the defendant has a special relationship may transform a crime into one involving moral turpitude.").

27

Penal Code § 273.5(a), is a crime involving moral turpitude. In the present case, Ortiz-Mondragon was convicted for battering his cohabiting girlfriend, not a spouse.

¶48 Furthermore, Ortiz-Mondragon's substantial battery conviction was under a Wisconsin statute, not a California statute. Because the cases cited by Ortiz-Mondragon do not discuss whether substantial battery under Wis. Stat. § 940.19(2) is a crime involving moral turpitude, those cases do not succinctly, clearly, and explicitly demonstrate that Ortiz-Mondragon's substantial battery under § 940.19(2) was a crime involving moral turpitude. See Garcia, 425 S.W.3d at 260-61 (holding that immigration law was not "clear, succinct, and straightforward" partly because the defendant "provided no federal judicial or administrative decision considering whether the Tennessee offenses to which he pleaded guilty amount to crimes involving moral turpitude, although the [defendant] has cited court decisions classifying abuse offenses in other jurisdictions as crimes involving moral turpitude"). Thus, Grageda and In re Tran do not succinctly, clearly, and explicitly demonstrate that Ortiz-Mondragon's substantial battery was a crime involving moral turpitude.

¶49 Ortiz-Mondragon also relies on cases in which courts held that aggravated assault of a peace officer and aggravated child abuse were crimes that qualified as crimes involving moral turpitude. See In re Danesh, 19 I. & N. Dec. 669, 673 (BIA 1988) (aggravated assault of peace officer); Garcia v. Attorney Gen. of United States, 329 F.3d 1217, 1222 (11th Cir. 2003)

28

(aggravated child abuse). However, as <u>Morales-Garcia</u> demonstrates, it is not safe to assume that Ortiz-Mondragon's substantial battery of his cohabiting girlfriend is necessarily a crime involving moral turpitude simply because aggravated assault of a peace officer and aggravated child abuse qualify as crimes involving moral turpitude. See <u>Morales-Garcia</u>, 567 F.3d at 1064-67 (holding that abuse of a cohabitant is not necessarily a crime involving moral turpitude, although spousal abuse contrary to California law necessarily is).

¶50 As the Board of Immigration Appeals has explained, "it has <u>often</u> been found that moral turpitude necessarily inheres in assault and battery offenses that are defined by reference to the infliction of bodily harm upon a person whom society views as deserving of special protection, such as . . . a domestic partner . . . ." <u>Sanudo</u>, 23 I. & N. Dec. at 971-72 (emphasis added) (citations omitted). However, such crimes do not categorically qualify as a crime involving moral turpitude. See <u>id.</u> Rather, "a case-by-case approach has been employed to decide whether battery (or assault and battery) offenses involve moral turpitude." <u>Id.</u> at 971. Thus, the State's argument that, "[w]hile Ortiz-Mondragon's conviction may well qualify as a crime of moral turpitude, that conclusion is not 'clear and certain' or 'succinct and straightforward,'" is correct.[17]

---

[17] Ortiz-Mondragon argues that if the case law on which he relies does not succinctly, clearly, and explicitly indicate that his substantial battery was a crime involving moral turpitude, then this court should look to his record of conviction, including the criminal complaint and plea hearing

(continued)

¶51 Based on the foregoing discussion, we conclude that federal immigration law does not succinctly, clearly, and explicitly provide that Ortiz-Mondragon's substantial battery was a crime involving moral turpitude such that his counsel's advice should have been different. The methodology for determining whether a crime qualifies as a crime involving moral turpitude varies by jurisdiction and is in a "state of flux."

---

transcript. In other words, he argues that this court should proceed to the second step of the two- or three-step test for determining whether a crime qualified as a crime involving moral turpitude. However, when determining whether a crime qualifies as a crime involving moral turpitude, a court looks to a record of conviction <u>only</u> if the statute of conviction is "divisible"——that is, only if the statute "includes some offenses which involve moral turpitude and some which do not." <u>In re Short</u>, 20 I. & N. Dec. 136, 137-38 (BIA 1989) (citations omitted) ("Only where the statute under which the respondent was convicted includes some offenses which involve moral turpitude and some which do not do we look to the record of conviction . . . ."). Because Ortiz-Mondragon does not argue that Wis. Stat. § 940.19(2) is divisible, his record of conviction will not help to determine whether his substantial battery qualified as a crime involving moral turpitude.

Further, Ortiz-Mondragon does not explain how the relevant immigration law would be succinct, clear, and explicit if one must consult a record of conviction under the two- or three-step test in order to determine whether a crime qualified as a crime involving moral turpitude. <u>See</u> <u>State v. Telford</u>, 22 A.3d 43, 50 (N.J. App. Div. 2011) (stating that an attorney "would be hard-pressed to provide any clear advice regarding the deportation consequences of a guilty plea" if the immigration advice could "turn on the precise wording of the indictment"). <u>See also</u> <u>Garcia v. State</u>, 425 S.W.3d 248, 260-61 (Tenn. 2013) (holding that immigration law did not succinctly, clearly, and explicitly provide that the defendant's conviction qualified as a crime involving moral turpitude); <u>Lopez-Penaloza v. State</u>, 804 N.W.2d 537, 545-46 (Iowa Ct. App. 2011) (same).

Baldini-Potermin, supra, 3-5; Telford, 22 A.3d at 49-50 (holding that a federal circuit split made the relevant immigration law not succinct, clear, and explicit). The cases that Ortiz-Mondragon cites fail to provide a succinct, clear, and explicit answer as to whether Ortiz-Mondragon's substantial battery qualified as a crime involving moral turpitude. Accordingly, his trial counsel "need[ed] [to] do no more than advise [him] that pending criminal charges may carry a risk of adverse immigration consequences." Padilla, 559 U.S. at 369. We now consider whether his counsel performed deficiently under Padilla.

### B. Whether Ortiz-Mondragon's Trial Counsel Performed Deficiently

¶52 "To demonstrate deficient performance, the defendant must show that his counsel's representation 'fell below an objective standard of reasonableness' considering all the circumstances." Carter, 324 Wis. 2d 640, ¶22 (quoting Strickland, 466 U.S. at 688). "In evaluating the reasonableness of counsel's performance, this court must be 'highly deferential.'" Id. (quoting Strickland, 466 U.S. at 689). "Counsel enjoys a 'strong presumption' that his conduct 'falls within the wide range of reasonable professional assistance.'" Id. (quoting Strickland, 466 U.S. at 689). "Indeed, counsel's performance need not be perfect, nor even very good, to be constitutionally adequate." Id. (citing Thiel, 264 Wis. 2d 571, ¶19).

¶53 Ortiz-Mondragon argues that his trial counsel, Attorney Singh, performed deficiently by failing to advise him that his conviction for substantial battery would necessarily result in his deportation and permanent exclusion from the United States. Ortiz-Mondragon concedes that "the circuit [court] found that the record affirmatively demonstrated that Mr. Ortiz-Mondragon received advice about the immigration consequences of his plea in the form of the general warnings contained in the plea questionnaire form as well as the circuit court's statutory warnings." However, he argues that the circuit court's statutory warning and the plea questionnaire are "insufficient" "substitute[s] for the advice of counsel."

¶54 Ortiz-Mondragon further argues that his trial counsel performed deficiently by failing to research the relevant immigration law and Ortiz-Mondragon's immigration status. He argues that "the record contains no evidence that defense counsel investigated Mr. Ortiz-Mondragon's immigration status or relevant law." He contends that "[e]ven when a more general warning is warranted, counsel must reasonably investigate the potential immigration consequences in light of the particular facts of the case because counsel cannot determine the clarity of a consequence without some investigation and research." He further argues that "[c]ounsel's failure to inform a defendant of the adverse immigration consequences when legal research would show that the crimes at issue involved moral turpitude for immigration purposes falls below an objective standard of reasonableness."

32

¶55 The State argues that, because the immigration consequences of the plea agreement were not succinct, clear, and explicit, "Ortiz-Mondragon's trial attorney was required to do no more than advise him that his plea 'may carry a risk of adverse immigration consequences.'" Padilla, 559 U.S. at 369. The State contends that "[t]he court should also uphold the circuit court's finding that Ortiz-Mondragon did, in fact, receive such a warning." The State does not separately address Ortiz-Mondragon's argument that his attorney failed to adequately research his immigration status or the immigration consequences of the plea agreement.

¶56 We will first determine whether Ortiz-Mondragon's trial counsel, Attorney Singh, performed deficiently by giving incorrect advice. We will next determine whether Attorney Singh performed deficiently by failing to adequately research the immigration consequences of the plea agreement.

¶57 The record in the circuit court demonstrates that Ortiz-Mondragon knowingly, intelligently, and voluntarily made no-contest pleas to the subject charges. The record further demonstrates that he knew he faced a risk of deportation and exclusion if he entered a no-contest plea to substantial battery. Not only does the record reveal that there were serious known concerns regarding an ongoing Immigration and Customs Enforcement hold, but despite that, Ortiz-Mondragon discussed this case with counsel, accepted the State's plea bargain, signed a plea questionnaire, and knowingly, intelligently, and voluntarily pled in the circuit court.

33

Specifically, his counsel, Attorney Singh, had "presented" the State's plea offer to him, "given him paperwork to use to study it, [and] given him information to use in counseling . . . ." Attorney Singh and the plea questionnaire both informed Ortiz-Mondragon that the "plea could result in deportation, the exclusion of admission to this country, or the denial of naturalization under federal law." The circuit court advised Ortiz-Mondragon: "If you're not a citizen of the United States, the plea you offer me could result in your deportation, the exclusion of admission, or the denial of naturalization under federal law." Ortiz-Mondragon's girlfriend stated that he and she were trying to keep their family together "in the states, but if he ends up with a felony charge, that's not going to happen." Ortiz-Mondragon himself stated that he carefully read the plea questionnaire and discussed it with his attorney before he signed it. Ortiz-Mondragon also stated that he understood the circuit court's immigration warning and wished to enter his no-contest pleas. All of these factors militate against the arguments that Ortiz-Mondragon makes today.

¶58 Moreover, when Ortiz-Mondragon filed a motion to withdraw his plea and request a Machner hearing, the circuit court correctly concluded that his motion did not warrant a hearing. While it is a defendant's burden to demonstrate that he is entitled to a Machner hearing by alleging sufficient facts to raise a question of fact, the circuit court correctly concluded that Ortiz-Mondragon's proffer was insufficient to warrant a Machner hearing. In fact, the circuit court concluded

34

that, "[u]nder the circumstances, [Ortiz-Mondragon] has not stated sufficient facts which entitle him to a hearing on his postconviction motion. The facts, as alleged, demonstrate that [Ortiz-Mondragon's] counsel did not perform deficiently by providing [Ortiz-Mondragon] with equivocal, rather than unequivocal, advice regarding the immigration-related consequences of his plea." It is well-established that a "circuit court has the discretion to deny the postconviction motion without a <u>Machner</u> hearing 'if the motion fails to allege sufficient facts to raise a question of fact, presents only conclusory allegations, or <u>if the record conclusively demonstrates that the defendant is not entitled to relief</u>.'" <u>State v. Roberson</u>, 2006 WI 80, ¶43, 292 Wis. 2d 280, 717 N.W.2d 111 (emphasis added in <u>Roberson</u>) (quoting <u>State v. Curtis</u>, 218 Wis. 2d 550, 555 n. 3, 582 N.W.2d 409 (Ct. App. 1998)).

¶59 In its order denying Ortiz-Mondragon's request for a <u>Machner</u> hearing and his motion to withdraw his plea, the circuit court found that "the record affirmatively establishes that trial counsel <u>did</u> so advise him" that "'pending criminal charges may carry a risk of adverse immigration consequences.'" This finding is not clearly erroneous.[18] The court noted that Ortiz-

---

[18] "Facts which are stated in a trial court's memorandum decision will be accorded the same weight as if they had been contained in formal findings." <u>Lambert v. Wrensch</u>, 135 Wis. 2d 105, 114-15, 399 N.W.2d 369 (1987) (citing <u>Hochguertel v. San Felippo</u>, 78 Wis. 2d 70, 86, 253 N.W.2d 526 (1977)).

35

Mondragon conceded "that he was given equivocal immigration warnings by both the Court, as required by [Wis. Stat. §] 971.08, and the Plea Questionnaire/Waiver of Rights form." The circuit court also noted that, at the plea and sentencing hearing, "[Ortiz-Mondragon] confirmed with the [c]ourt that he read [the plea questionnaire] over carefully before signing it and had the opportunity to fully discuss it with his attorney." The circuit court further noted that Attorney Singh signed the plea questionnaire, thereby affirming that he discussed it with Ortiz-Mondragon and that he believed Ortiz-Mondragon understood it and the plea agreement.

¶60 The immigration advice that Ortiz-Mondragon received stands in stark contrast to the incorrect immigration advice that was given in Padilla. In contrast to the present case, the immigration law in Padilla was "succinct, clear, and explicit" in providing that Padilla's conviction made him "eligible for deportation." Padilla, 559 U.S. at 368. Thus, Padilla's attorney was required to do more than advise him that his conviction may carry a risk of adverse immigration consequences. Id. at 369. But "Padilla's counsel provided him false assurance that his conviction would not result in his removal from this country." Id. at 368. That "advice was incorrect." Id. at 369. By contrast, the advice that Ortiz-Mondragon received was correct.

¶61 In fact, had Attorney Singh given the immigration advice that Ortiz-Mondragon argues he should have given, he may well have given incorrect advice. Because federal immigration

36

law does not succinctly, clearly, and explicitly provide that Ortiz-Mondragon's substantial battery was a crime involving moral turpitude, it may well have been inaccurate for Attorney Singh to unequivocally tell Ortiz-Mondragon that the immigration authorities would determine that his substantial battery was a crime involving moral turpitude. Accordingly, it also may well have been inaccurate for Attorney Singh to unequivocally tell Ortiz-Mondragon that he would be deportable and inadmissible to the United States on grounds of moral turpitude if convicted of substantial battery.

¶62 We note that incorrect advice that a plea will result in deportation or exclusion, like incorrect advice that a plea will not result in deportation or exclusion, could impact an alien defendant's decisionmaking. The former kind of misinformation might encourage a defendant to reject a beneficial plea offer and thereby subject him or herself to significantly more exposure. The latter kind of misinformation could cause a defendant to be surprised with the actual immigration consequences. Counsel should give accurate advice. Counsel should avoid overstating or understating the possible immigration consequences of a conviction. Ortiz-Mondragon's position, if adopted, would require more of an attorney than is required under Padilla because it is not succinct, clear, and explicit that Ortiz-Mondragon's substantial battery is a crime involving moral turpitude.[19]

---

[19] Case law demonstrates that even if immigration
(continued)

37

¶63 In sum, we conclude that Ortiz-Mondragon's trial counsel did not perform deficiently by advising him that the plea agreement "could result in deportation, the exclusion of admission to this country, or the denial of naturalization under federal law." That warning was correct and adequate under Padilla because it informed Ortiz-Mondragon that a conviction may carry a risk of adverse immigration consequences.

¶64 We turn briefly to Ortiz-Mondragon's argument that his attorney performed deficiently by failing to perform an adequate amount of research. Contrary to Ortiz-Mondragon's assertion, the record contains evidence that Attorney Singh researched Ortiz-Mondragon's immigration status and relevant immigration law. For example, at the plea and sentencing hearing, the circuit court asked Ortiz-Mondragon's attorney, Attorney Singh, whether Ortiz-Mondragon had an Immigration and Customs Enforcement hold. Attorney Singh stated that "I think there is, but the information I get is secondhand," indicating that Attorney Singh had conducted some research into the matter. Further, at the plea and sentencing hearing, Attorney Singh informed the court that he had "presented" the State's plea

___

proceedings were commenced against Ortiz-Mondragon for the substantial battery being a crime involving moral turpitude, whether his substantial battery would qualify as a deportable offense could be, and likely would be, contested in those proceedings. See Abdelqadar v. Gonzales, 413 F.3d 668, 673-74 (7th Cir. 2005) (holding that an alien was not deportable under 8 U.S.C. § 1227(a)(2)(A)(i) because his crime involving moral turpitude occurred more than five years after he initially entered the United States).

38

offer to Ortiz-Mondragon, "given him paperwork to use to study it, [and] given him information to use in counseling . . . ." Immediately thereafter, Attorney Singh handed a signed plea questionnaire and waiver of rights form, along with "some other papers," to the court.

¶65 Because the record provides evidence that Ortiz-Mondragon's attorney did some level of research regarding the immigration consequences of the plea agreement, we turn now to Ortiz-Mondragon's argument that his attorney was deficient for failing to perform additional research.  Ortiz-Mondragon argues that additional research would have revealed that his substantial battery is a crime involving moral turpitude. Ortiz-Mondragon relies on Commonwealth v. Balthazar, 16 N.E.3d 1143 (Mass. App. Ct. 2014), and Montes-Flores v. United States, No. 2:11-CR-032-JMS-CMM, 2013 WL 428024 (S.D. Ind. Feb. 4, 2013).

¶66 In Balthazar the defendant moved to withdraw his guilty pleas to larceny and malicious destruction of property after the Immigration and Naturalization Service began deportation proceedings against him as a result of the convictions.  Commonwealth v. Balthazar, 16 N.E.3d 1143, 1145 & n.3 (Mass. App. Ct. 2014).  He alleged that he received ineffective assistance of counsel when his attorney told him that he would not be deported because the charges had been reduced to misdemeanors.  Id. at 1145, 1147.  The Massachusetts Appeals Court held that, "[a]s legal research would have indicated that the crimes were ones involving moral turpitude, we must conclude . . . that counsel's failure to inform the

39

defendant that pleading guilty to the charges would subject him to presumptively mandatory deportation fell below an objective standard of reasonableness."  Id. at 1147-48.

¶67  In Montes-Flores the defendant pled guilty to making a material false statement in violation of 18 U.S.C. § 1001(a)(2). Montes-Flores v. United States, No. 2:11-CR-032-JMS-CMM, 2013 WL 428024, at *1-2 (S.D. Ind. Feb. 4, 2013).  Prior to the plea, her attorney "'told her that it was possible that she could face deportation but that it will be up to the immigration judge to decide.'"  Id. at *3.  The federal district court granted the defendant's post-sentencing motion to withdraw her plea on grounds of ineffective assistance of counsel.  Id. at *2, *4-5. The court held that the attorney's immigration advice was deficient because, "[w]hile crimes of 'moral turpitude' are not specifically defined in the statute, the Seventh Circuit has repeatedly held that '[t]here can be no question that a violation of [18 U.S.C. §] 1001 is a crime involving moral turpitude.'"  Id. at *4 (emphases added) (internal citation omitted) (quoting Ghani v. Holder, 557 F.3d 836, 840 (7th Cir. 2009)) (citing Benaouicha v. Holder, 600 F.3d 795, 797 (7th Cir. 2010)).  Thus, "counsel's failure to inform Montes-Flores that a conviction under § 1001 would result in presumptively mandatory deportation was objectively unreasonable."  Id. at *5.  The court further held that the deficient performance prejudiced the defendant. Id. at *6.

¶68 Balthazar  and  Montes-Flores  are  distinguishable. Unlike in those cases, additional research in the present case

40

would <u>not</u> have revealed that the crime at issue clearly qualified as a crime involving moral turpitude. Thus, even had Attorney Singh performed additional research, his immigration advice would not have changed. As we explained earlier, federal immigration law does not succinctly, clearly, and explicitly provide that Ortiz-Mondragon's substantial battery is necessarily a crime involving moral turpitude. This lack of clarity presents a far different situation than that in <u>Balthazar</u> and <u>Montes-Flores</u>. Unlike the defendant in <u>Montes-Flores</u>, Ortiz-Mondragon has <u>not</u> shown that the Seventh Circuit has "repeatedly held" that there can be "no question" that his conviction was for a crime involving moral turpitude.[20] <u>See</u>

---

[20] Although not cited by Ortiz-Mondragon, we recognize that in some Seventh Circuit deportation cases the defendant conceded that his domestic battery qualified as a crime involving moral turpitude. <u>See</u> <u>Coyomani-Cielo v. Holder</u>, 758 F.3d 908, 910-11 (7th Cir. 2014) (noting that, after an immigration judge determined that the defendant was removable because his domestic battery "qualifies as a [crime involving moral turpitude]" and "'an aggravated felony,'" the defendant argued that "he is subject [to removal] only" for committing a crime involving moral turpitude but that "he might be eligible for cancellation of removal"); <u>Castellanos v. Holder</u>, 652 F.3d 762, 764 (7th Cir. 2011) (noting that the defendant "denied that he committed an aggravated felony or a crime of domestic violence, but conceded that he was removable as an alien convicted of two crimes involving moral turpitude"); <u>Benaouicha v. Holder</u>, 600 F.3d 795, 798 (7th Cir. 2010) (noting that the defendant "conceded that he is deportable under [8 U.S.C. §] 1227(a)(2)(A)(i) for having been convicted of a crime of moral turpitude"). The Seventh Circuit in those cases did not hold that the domestic battery crimes at issue qualified as crimes involving moral turpitude. Further, the defendants in those cases were convicted for domestic battery under Illinois and Indiana statutes, not Wis. Stat. § 940.19(2). Thus, those cases do not succinctly, clearly, and explicitly demonstrate that Ortiz-Mondragon's substantial

(continued)

41

Montes-Flores, 2013 WL 428024, at *4.  Although the circuit court did not make specific findings with respect to what research Attorney Singh performed and which paperwork he provided to the court and Ortiz-Mondragon, we can infer that the circuit court implicitly found that Attorney Singh performed an adequate amount of research.  See State v. Hubanks, 173 Wis. 2d 1, 27, 496 N.W.2d 96 (Ct. App. 1992) (citation omitted) ("The [circuit] court found that Hubanks had not been denied effective assistance of counsel.  Although the [circuit] court did not make specific findings of fact, we may assume on appeal that such findings of fact were made implicitly in favor of its decision.").  Accordingly, unlike defense counsel in Balthazar and Montes-Flores, Attorney Singh was not deficient for failing to perform additional legal research, which would not have changed his immigration advice.

¶69 We conclude that the immigration advice that Attorney Singh provided to Ortiz-Mondragon was sufficient under Padilla. Because the law is not "succinct, clear, and explicit" with respect to whether Ortiz-Mondragon's substantial battery was a crime involving moral turpitude, his trial counsel "need[ed] [to] do no more than advise [him] that pending criminal charges may carry a risk of adverse immigration consequences."  See Padilla, 559 U.S. at 369 (emphases added).  Counsel met that requirement by advising Ortiz-Mondragon that the "plea could

battery under § 940.19(2) was a crime involving moral turpitude. See supra ¶48.

42

result in deportation, the exclusion of admission to this country, or the denial of naturalization under federal law." See Garcia, 425 S.W.3d at 260-61 (holding that, because the defendant's crimes did not clearly qualify as crimes involving moral turpitude, counsel gave adequate advice by stating that the guilty pleas "might or might not have an adverse affect on his ability to return legally to the United States"); Lopez-Penaloza, 804 N.W.2d at 546 (holding that, because the defendant's crime did not clearly qualify as a crime involving moral turpitude, counsel gave adequate advice by stating "'that a criminal conviction, deferred judgment, or deferred sentence may affect [her] status under federal immigration laws'").

## IV. CONCLUSION

¶70 We conclude that Ortiz-Mondragon is not entitled to withdraw his no-contest plea to substantial battery because he did not receive ineffective assistance of counsel. Specifically, his trial counsel did not perform deficiently. Because federal immigration law is not "succinct, clear, and explicit" in providing that Ortiz-Mondragon's substantial battery constituted a crime involving moral turpitude, his attorney "need[ed] [to] do no more than advise [him] that pending criminal charges may carry a risk of adverse immigration consequences." See Padilla, 559 U.S. at 369. Ortiz-Mondragon's trial attorney satisfied that requirement by conveying the information contained in the plea questionnaire and waiver of rights form——namely, that Ortiz-Mondragon's "plea could result in deportation, the exclusion of admission to this country, or

43

the denial of naturalization under federal law." Counsel's advice was correct, not deficient, and was consistent with Wis. Stat. § 971.08(1)(c). In addition, Ortiz-Mondragon's trial attorney did not perform deficiently by failing to further research the immigration consequences of the plea agreement. Because Ortiz-Mondragon failed to prove deficient performance, we do not consider the issue of prejudice.

*By the Court.*—The decision of the court of appeals is affirmed.

¶71 ANN WALSH BRADLEY, J. *(dissenting).* This case represents yet another example of the intersection of state criminal law with the federal immigration law. It likewise offers another example of why the mantra of the bar and bench alike should be: read the relevant statute.

¶72 Had the attorney merely read the governing statute, he would have discovered that the crime to which Ortiz-Mondragon pled made him deportable. Aside from the subsection on crimes involving moral turpitude (CIMTs), the statute has another subsection clearly rendering noncitizens deportable for a conviction of domestic violence. 8 U.S.C § 1227(a)(2)(E)(i).

¶73 Because the consequence of a conviction is clear, the duty to give accurate immigration advice is likewise clear. Padilla v. Kentucky, 559 U.S. 356, 368 (2010) ("when the deportation consequence is truly clear, . . . the duty to give correct advice is equally clear.").

¶74 Nevertheless, the majority essentially ignores the relevant domestic abuse subsection of the statute and the attorney's apparent failure to read it, and engages in a lengthy discussion of CIMTs. Rather than focusing on whether the specific crime at issue qualifies as a CIMT under the controlling federal precedent, it focuses instead on whether there is a clear definition of "crime of moral turpitude" and a consistent application of the concept across the federal judicial circuits.

1

¶75 Because the circuit court denied Ortiz-Mondragon's motion for postconviction relief without a hearing, it is hard to know the extent of the information the attorney provided and his basis for it. The record is wholly insufficient to determine the merits of the claim. The majority, however, purports to perform this task, concluding that Ortiz-Mondragon's claim must fail.

¶76 Padilla's requirement that attorneys inform their clients of the immigration consequences of entering a plea was not a mere suggestion. It set the standard for attorney performance under the Sixth Amendment. Unlike the majority, I conclude that Ortiz-Mondragon's claim of a Padilla violation cannot be so quickly brushed aside.

¶77 Because the consequence of deportation is clear under the subsection on domestic abuse (8 U.S.C. § 1227(a)(2)(E)(i)), the duty under the Sixth Amendment to give correct advice is likewise clear. Given that no hearing was held, it is impossible to know the nature and extent of the advice given to the defendant. Without a developed record, it is also impossible to determine whether there was a violation of the defendant's Sixth Amendment right to effective assistance of counsel. Accordingly, I would remand to the circuit court for a Machner hearing.[1]

---

[1] In State v. Machner, 92 Wis. 2d 797, 804, 285 N.W.2d 905 (Ct. App. 1979), the court of appeals determined that when a defendant raises an ineffective assistance of counsel claim a hearing is necessary to obtain trial counsel's testimony. These hearings have become known as "Machner hearings."

I

¶78 The majority ignores that had defense counsel done the bare minimum amount of research and merely read the governing statute, he would have discovered that the crime to which Ortiz-Mondragon pled made him deportable. Aside from the subsection on CIMTs, the statute has another subsection clearly rendering noncitizens deportable for a conviction of domestic violence: 8 U.S.C. § 1227(a)(2)(E)(i).

¶79 In language that is clear and succinct, that subsection provides that any noncitizen who at any time after admission is convicted of a crime of domestic violence is deportable:

> Any alien who at any time after admission is convicted of a <u>crime of domestic violence</u>, a crime of stalking, or a crime of child abuse, child neglect, or child abandonment <u>is deportable</u>.

8 U.S.C. § 1227(a)(2)(E)(i) (emphasis added).

¶80 The subsection further details what qualifies as a crime of domestic violence:

> For purposes of this clause, the term "crime of domestic violence" means any crime of violence (as defined in section 16 of Title 18) against a person committed by a current or former spouse of the person, by an individual with whom the person shares a child in common, by an individual who is cohabiting with or has cohabited with the person as a spouse, by an individual similarly situated to a spouse of the person under the domestic or family violence laws of the jurisdiction where the offense occurs, or by any other individual against a person who is protected from that individual's acts under the domestic or family violence laws of the United States or any

3

State, Indian tribal government, or unit of local government.

8 U.S.C. § 1227(a)(2)(E)(i).[2]

¶81 If there is any doubt about the plain meaning of the subsection of the statute, it is put to rest by a recent decision by the United States Supreme Court. In <u>Mellouli v. Lynch</u>, 135 S. Ct. 1980, 1990 n.11 (June 1, 2015), the Court described the subsection as "specif[ying] the conduct that subjects an alien to removal." <u>See also</u> <u>id.</u> at 1992 (Thomas, J. dissenting) (describing § 1227(a)(2)(E)(i) as "making removable '[a]ny alien who . . . is convicted of a crime of domestic violence,' where 'the term "crime of domestic violence" means any crime of violence . . . committed by' a person with a specified family relationship with the victim").

¶82 This is in accord with prior circuit court decisions. <u>See, e.g.,</u> <u>Carrillo v. Holder</u>, 781 F.3d 1155 (9th Cir. 2015) (noncitizen rendered removable due to his domestic violence conviction); <u>Florez v. Holder</u>, 779 F.3d 207, 209 (2d Cir. 2015) ("8 U.S.C. § 1227(a)(2)(E)(i), [] makes any alien removable if,

---

[2] Section 16 of title 18 defines "crime of violence" as:

> (a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
>
> (b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 16.

'at any time after admission,' the alien 'is convicted of a crime of domestic violence, a crime of stalking, or a crime of child abuse, child neglect, or child abandonment.'"); <u>Gonzalez-Gonzalez v. Ashcroft</u>, 390 F.3d 649, 650 (9th Cir. 2004) ("§ 1227 is titled 'Deportable aliens' and 'Domestic Violence' is listed as an offense under § 1227(a)(2), which lists criminal grounds of deportation."); <u>Csekinek v. INS</u>, 391 F.3d 819, 826-827 (6th Cir. 2004) (observing that 8 U.S.C. § 1227(a)(2)(E)(i) "renders deportable any alien convicted of a domestic violence offense after entry into the United States.").[3]

¶83 Like a conviction for a CIMT, a domestic violence conviction renders noncitizens ineligible for relief under 8 U.S.C. § 1229b(b). In relevant part, it provides that "The Attorney General may cancel removal of, and adjust to the status of an alien lawfully admitted for permanent residence, an alien who is inadmissible or deportable from the United States if the alien—— . . . has not been convicted of an offense under section 1182(a)(2), 1227(a)(2), or 1227(a)(3) of this title." 8 U.S.C. § 1229b(b)(1). Both CIMTs and crimes of domestic violence are listed in 8 U.S.C. § 1227(a)(2).

---

[3] Notably, although deportation for CIMTs is limited to CIMTs "committed within five years (or 10 years in the case of an alien provided lawful permanent resident status under section 1255(j)) after the date of admission," 8 U.S.C. § 1227(a)(2)(A)(i)(I), a conviction for a crime of domestic violence is not so limited. 8 U.S.C. § 1227(a)(2)(E)(i) states that a crime of domestic violence occurring at "any time after admission" will render a noncitizen deportable.

5

¶84 Fundamental to the practice of law is being familiar with the relevant statutes. Failure to do so constitutes a quintessential example of deficient performance. See Hinton v. Alabama, 134 S. Ct. 1081, 1089 (2014) ("[a]n attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under Strickland.").

¶85 Reading the governing statutes is required by the prevailing professional norms which, under Strickland, set the standards for deficient performance. Strickland v. Washington, 466 U.S. 668, 688 (1984) ("[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms."). For example, Standard 4-6.3(d) of the ABA Standards for Criminal Justice, Prosecution and Defense Functions (4th ed. 2015), states that "[d]efense counsel should investigate and be knowledgeable about sentencing procedures, law, and alternatives, collateral consequences and likely outcomes, . . . and advise the client on these topics before permitting the client to enter a negotiated disposition."

¶86 Likewise, Standard 14-3.2 of the ABA Standards for Criminal Justice, Pleas of Guilty (3d ed. 1999), requires attorneys to investigate the law before advising defendants about pleas. The commentary advises that because the immigration consequence of a guilty plea may well be a client's greatest priority, "counsel should be familiar with the basic immigration consequences that flow from different types of

6

guilty pleas, and should keep this in mind in investigating law and fact and advising the client." Id. at 127.

¶87 Here, had defense counsel read the governing statute he would have been able to provide Ortiz-Mondragon with more than a general warning.[4] Nevertheless, the majority attempts to circumvent this problem by simply dismissing the domestic abuse subsection in a footnote. It ignores not only the clear language of the subsection but also Padilla's clear directive: attorneys must "provide [their] client[s] with available advice . . . ." Padilla, 559 U.S. at 371.

II

¶88 Rather than discussing the plain language of the domestic abuse subsection or focusing on whether the crime at issue renders Ortiz-Mondragon deportable, the majority takes a different approach. It discusses the lack of definition of CIMTs in the immigration statute, that other courts have deemed the term "crime involving moral turpitude" ambiguous, and that

---

[4] The majority's determination that defense counsel did adequate research is highly speculative. It refers to defense counsel's statement that "the information I get is secondhand," his statement that he had given Ortiz-Mondragon "paperwork," and that he handed the signed plea questionnaire and waiver of rights form, along with "some other papers," to the court. The majority contends that these facts are evidence that he did "some level of research." Majority op., ¶64. It then "infer[s] that the circuit court implicitly found that [defense counsel] performed an adequate amount of research." Id., ¶68. The flimsy details that the majority points to say nothing about what that research was or what the attorney knew. Without a Machner hearing, this information is unknowable.

7

different circuits have different tests for determining whether a crime is a CIMT. Majority op., ¶¶37, 39, 41. Accordingly, the majority concludes that the immigration consequences were unclear and that defense counsel's performance was not deficient because he needed to do no more than tell Ortiz-Mondragon that a conviction may have negative immigration consequences.

¶89 The majority ignores, however, that this case did not require defense counsel to determine the definition of a CIMT. Rather he needed to determine only if the crime Ortiz-Mondragon faced, substantial battery with a domestic abuse enhancer, qualified as a CIMT. Further, defense counsel was not required to determine what other federal circuits would have done. Rather, he should have looked at the law in the Seventh Circuit, which governs Ortiz-Mondragon's case.

¶90 Review of removal proceedings conducted in this federal judicial circuit is performed by the Seventh Circuit Court of Appeals and therefore its precedent governs those cases. See 8 U.S.C. § 1252(b)(2) ("The petition for review shall be filed with the court of appeals for the judicial circuit in which the immigration judge completed the proceedings.").

¶91 Immigration removal proceedings for Wisconsin residents, such as Ortiz-Mondragon, are conducted in Chicago. See Executive Office for Immigration Review, Department of Justice, "EOIR Immigration Court Listing" (2015), available at www.justice.gov/eoir/immigration-court-administrative-control-

8

list#Chicago.[5]   Thus, upon completion of his sentence Ortiz-Mondragon's removal proceeding would have occurred in Chicago and Seventh Circuit Court of Appeals precedent would govern.

¶92 A basic search of Seventh Circuit cases provides a clear answer to whether domestic battery qualifies as a CIMT. The answer is "yes."  In Coyomani-Cielo v. Holder, the Seventh Circuit plainly stated that "[defendant] was convicted of domestic battery, which qualifies as a CIMT . . . ."  758 F.3d 908, 910 (7th Cir. 2014).

¶93 The majority attempts to explain away this clear statement by inaccurately asserting that it was presented as a concession by the defendant.  Majority op., ¶68 n.20.  It was neither a concession nor even a debatable point. Rather, the court made this statement as a clear statement of fact in its description of the background of the case.

¶94 Admittedly, Coyomani-Cielo considered a conviction under Illinois law.  Accordingly, to determine whether Ortiz-Mondragon's conviction would be a CIMT, one must take the additional step of comparing the Illinois statute at issue in that case, 720 ILCS 5/12-3.2, with the Wisconsin statutes at issue, Wis. Stat. §§ 940.19(2), 968.075.

¶95 Under the Illinois statute, domestic battery is committed by: "knowingly without legal justification by any means: (1) Caus[ing] bodily harm to any family or household

---

[5] The DOJ list of immigration courts and their assigned geographic responsibilities is published pursuant to 8 C.F.R. § 1003.11.

9

member; (2) Mak[ing] physical contact of an insulting or provoking nature with any family or household member."[6] Under the Wisconsin statute, Ortiz-Mondragon was convicted of "caus[ing] substantial bodily harm to another by an act done with intent to cause bodily harm to that person or another." Wis. Stat. § 940.19(2). The domestic abuse enhancer means that the individual Ortiz-Mondragon inflicted harm on was "his or her spouse or former spouse, . . . an adult with whom [he] resides or formerly resided or . . . an adult with whom the person has a child in common." Wis. Stat. § 968.075.

¶96 The statutes reveal that a Wisconsin conviction for substantial battery with a domestic abuse enhancer necessarily would qualify as domestic battery under Illinois law. Thus, the crime for which Ortiz-Mondragon was convicted should likewise be deemed a CIMT.

¶97 Other Seventh Circuit precedent is in accord. In Garcia-Meza v. Mukasey, 516 F.3d 535 (7th Cir. 2008), the court

---

[6] Illinois defines "family or household member" as including:

> spouses, former spouses, parents, children, stepchildren, and other persons related by blood or by present or prior marriage, persons who share or formerly shared a common dwelling, persons who have or allegedly have a child in common, persons who share or allegedly share a blood relationship through a child, persons who have or have had a dating or engagement relationship, persons with disabilities and their personal assistants, and caregivers as defined in Section 12-4.4a of this Code.

720 ILCS 5/12-0.1

10

considered whether aggravated battery of a police officer qualified as a CIMT. The court observed that "crimes involving moral turpitude are usually serious crimes (in terms of the magnitude of the loss they cause or the indignation in the public they arouse) that are committed deliberately." Id. at 536. It commented that precedent has "emphasized the bodily harm requirement in concluding that the assault crime was serious enough to be turpitudinous." Id. at 537. It then referred to precedent determining that "moral turpitude necessarily inheres in assault and battery offenses that are defined by reference to the infliction of bodily harm upon a person whom society views as deserving of special protection, such as a child, a domestic partner, or a peace officer." In re Sanudo, 23 I.& N. Dec. 968, 971-72 (B.I.A. 2006).

¶98 Ultimately, the Seventh Circuit determined that battery of a police officer did not necessarily constitute a CIMT because the Illinois statute at issue did not include bodily harm as an element. Garcia-Meza, 516 F.3d at 538. Garcia-Meza is instructive. Its analysis reveals that a crime qualifies as a CIMT when it includes as an element bodily harm to a person who society recognizes as deserving of special protection, such as a domestic partner. See also Castellanos v. Holder, 652 F.3d 762, 764 (7th Cir. 2011) (defendant conceded his domestic battery conviction constituted a CIMT); Benaouicha v. Holder, 600 F.3d 795, 797 (7th Cir. 2010) (noting defendant's concession that his conviction for the battery of his wife

11

constituted a conviction for a CIMT).[7] Ortiz-Mondragon's conviction for substantial battery with a domestic abuse enhancer meets these criteria.

¶99 Even if defense counsel had been unable to find and analyze the governing precedent, he could have determined that substantial battery with a domestic abuse enhancer qualified as a CIMT by consulting legal practice guides. Padilla instructs attorneys to consult guidebooks to educate themselves about the relevant immigration law: "we expected that counsel who were unaware of the discretionary relief measures would 'follo[w] the advice of numerous practice guides.'" 559 U.S. at 368.

¶100 Practice guides indicate that substantial battery with a domestic abuse enhancer qualifies as a CIMT. For example,

---

[7] Although they are not binding, it is notable that other jurisdictions have determined that crimes comparable to substantial battery with a domestic abuse enhancer constitute CIMTs. See, e.g., Medina v. United States, 259 F.3d 220, 228 (4th Cir. 2001) ("we find it significant that Medina's crime was carried out against his former fiancée, Maria Bracho. The INS——which is statutorily authorized to administer the immigration laws and determine what constitutes a CIMT——has, in the past several years, taken steps to assert that crimes of assault upon victims that have a 'special relationship' with the assaulter may be a CIMT."); Toutounjian v. INS, 959 F. Supp. 598, 603 (W.D.N.Y. 1997) ("Sexual or physical abuse of women or children has been almost uniformly found to involve a crime of moral turpitude."); In re Tran, 21 I. & N. Dec. 291, 292-93 (BIA 1996) (concluding that acts of violence against someone in a special relationship with the assaulter is "different from [assault] between strangers or acquaintances," and is a CIMT). The one case the majority cites as stating to the contrary, Morales-Garcia v. Holder, 567 F.3d 1058 (9th Cir. 2009), has not been followed outside of the Ninth Circuit.

Maria Baldini-Porterman's comprehensive guide on immigration consequences conveys the same information as Garcia-Meza:

> Where the elements of a domestic battery offense do not require either actual infliction of serious harm or specific intent and physical injury to the victim, the offense is not categorically a crime involving moral turpitude. The willful infliction of corporal injury on a spouse, cohabitant, or parent of the offender's child in violation of California Penal Code § 273.5(a) has been found to be a crime involving moral turpitude.

Maria Baldini-Porterman, Defending Non-Citizens in Illinois, Indiana and Wisconsin (Heartland Alliance's National Immigrant Justice Center 2009).

¶101 Likewise, another practice guide states: "moral turpitude has been found where the assault and battery offenses are defined by reference to the infliction of bodily harm on someone whom society views as deserving of special protection (such as a child or spouse)." Austin T. Fragomen, Jr. and Steven C. Bell, Immigration Fundamentals: A Guide to Law and Practice, § 7:2.2 at 7-32 (4th ed. 2014).

¶102 The "Immigration Consequences Crimes Summary Checklist," published by the Immigrant Defense Project (2010), provides even clearer guidance. Its list of CIMTs includes "[c]rimes in which bodily harm is caused or threatened by an intentional act . . . ." Ortiz-Mondragon's conviction for substantial battery with a domestic abuse enhancer unquestionably meets these requirements. As noted above, substantial battery is defined as "caus[ing] substantial bodily harm to another by an act done with intent to cause bodily harm to that person or another." Wis. Stat. § 940.19(2).

13

¶103 By focusing on the difficulty of defining "crimes of moral turpitude" and the different approaches the circuit courts take in determining whether a crime is a CIMT, the majority hides the fact that a conviction for substantial battery with a domestic abuse enhancer qualifies as a CIMT in the Seventh Circuit. Whether by reading the plain language of the domestic abuse subsection of the statute or by following clear Seventh Circuit precedent, defense counsel should have discovered the immigration consequences of Ortiz-Mondragon's plea. It was clear the plea would render him deportable. Thus, "the duty to give correct advice is equally clear." Padilla, 559 U.S. at 368. Defense counsel was obligated to provide the advice that was available. Id., 371.

¶104 As explained above, the United States Supreme Court has instructed, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." Strickland, 466 U.S. at 688. In criminal representation, this "entails certain basic duties," including the "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Id. at 688, 691. "[A]n attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under Strickland." Hinton v. Alabama, 134 S. Ct. 1081, 1089 (2014).

¶105 The majority conducts no inquiry into whether defense counsel's research was reasonable under professional norms, or

14

whether defense counsel was ignorant on a fundamental point of law (i.e. the immigration consequences of a plea), nor could it. Without a <u>Machner</u> hearing the record is silent in this respect. Just as the record fails to show what warnings defense counsel provided, it also fails to show that he did adequate research into the immigration issue.

### III

¶106 In contrast to the majority, I would remand this case for a <u>Machner</u> hearing. Such hearings are required unless the motion claiming ineffectiveness "presents only conclusory allegations," "fails to allege sufficient facts to raise a question of fact," or "if the record conclusively demonstrates that the defendant is not entitled to relief." <u>Roberson</u>, 292 Wis. 2d 280, ¶43.

¶107 Ortiz-Mondragon's motion is quite detailed and alleges sufficient facts which, if true, show that he is entitled to relief. It details that his plea rendered him ineligible for cancellation of his removal:

> Mr. Ortiz-Mondragon pleaded no contest to substantial battery, domestic abuse, contrary to Wis. Stat. § 940.19(2). This is a crime involving moral turpitude. The maximum sentence for this offense is 3.5 years of imprisonment. Because the maximum period of confinement exceeds one year, Mr. Ortiz-Mondragon's conviction rendered him ineligible for cancellation of removal.

It also explains that the plea prevents Ortiz-Mondragon from returning to the United States:

> [B]ecause of his convictions, Mr. Ortiz-Mondragon is permanently excluded from legally re-entering the United States. An individual applying for admission

15

to the United States cannot have been convicted for a crime involving moral turpitude. INA §212(a)(2)(A)(i)(I). The only exception is when the conviction involves a crime for which the maximum punishment is less than one year, and the actual sentence of the court does not exceed six months.

¶108 Further, the motion alleges that defense counsel was deficient for failing to advise him of these consequences: "[Ortiz-Mondragon] was not properly advised of the adverse immigration consequences of his plea." It explains what his attorney should have told him: "counsel's advice to Mr. Ortiz-Mondragon should have been that accepting a plea agreement in which he would plead guilty or no contest to substantial battery-domestic abuse would result in automatic removal and permanent exclusion from the United States." It then claims that his attorney failed to provide this advice: "trial counsel failed to advise him of adverse immigration consequences of his plea, specifically that the convictions mandated removal and resulted in permanent exclusion from the country once removed."

¶109 Finally, the motion alleges that this deficient performance prejudiced Ortiz-Mondragon: "Mr. Ortiz-Mondragon would have gone to trial instead of pleading no contest had he known his convictions made him automatically deportable and permanently excluded." It explains that "[Ortiz-Mondragon] has already left the country and is now in Mexico. Due to his conviction, he was unable to apply for cancellation of his removal and he is now permanently excluded from re-entering the country." "[H]ad Mr. Ortiz-Mondragon known and understood the consequences of a conviction for substantial battery, he would

16

have attempted to negotiate a plea agreement that avoided the automatic and permanent consequences he now faces."

¶110 These facts, if true, show that Ortiz-Mondragon's attorney was deficient because he did not meet the Padilla requirements. They also sufficiently allege that the deficiency prejudiced Ortiz-Mondragon. Thus, if true, the allegations establish a violation of Ortiz-Mondragon's Sixth Amendment rights, entitling him to relief.

¶111 Nothing in the record conclusively rebuts Ortiz-Mondragon's claim. It does not indicate what, if anything, defense counsel told Ortiz-Mondragon about the immigration consequences of his plea. It also fails to indicate the basis for that advice, whether it was grounded in research, and whether it was reasonable under prevailing professional norms.

¶112 None of the scenarios that would preclude a Machner hearing are present. Roberson, 292 Wis. 2d 280, ¶43 (Machner hearing not required if the motion "presents only conclusory allegations," "fails to allege sufficient facts to raise a question of fact," or "if the record conclusively demonstrates that the defendant is not entitled to relief."). Accordingly, a Machner hearing is required to determine the merits of Ortiz-Mondragon's claim.

IV

¶113 Under Padilla, attorneys representing noncitizens must research the relevant immigration consequences of a conviction and provide that information to their clients. These requirements are important protections to noncitizens.

17

¶114 Each of the majority's errors removes some of that protection. By ignoring statutory grounds rendering Ortiz-Mondragon deportable, the majority implicitly approves of attorneys not reading the governing immigration statutes, leaving the door open for uninformed, inaccurate advice. By determining that the immigration consequences of Ortiz-Mondragon's plea are unclear because the definition of CIMT is unclear, the majority reduces the number of situations in which attorneys must provide available immigration advice.

¶115 In contrast to the majority, I believe that Padilla's requirements have teeth. Had defense counsel researched the immigration consequences of Ortiz-Mondragon's plea, he would have discovered that it rendered Ortiz-Mondragon deportable. Under Padilla, that means that defense counsel was required to convey that information to his client. Ortiz-Mondragon should have the opportunity to prove that such advice was not given and that he was prejudiced as a result. Therefore a remand is required and a Machner hearing is necessary.

¶116 For the reasons set forth above, I respectfully dissent.

¶117 I am authorized to state that Justice SHIRLEY S. ABRAHAMSON joins this dissent.